# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| COLIN LACRUE and JONATHON TRAHAN, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>VEXUS FIBER, LLC,<br><br>    Defendant. | **CASE NO:** _2:25-cv-4175_____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiffs Colin LaCrue and Jonathon Trahan, individually and on behalf of all others similarly situate, by and through their counsel, hereby files this class action complaint against Defendant Vexus Fiber, LLC ("Vexus"), and in support thereof allege as follows:

## NATURE OF THE ACTION

1. Plaintiffs bring this proposed class action on behalf themselves and similarly situated consumers against Vexus arising from its routine bait-and-switch scheme of deceiving consumers with fictitiously low-price advertisements for its broadband internet service and then automatically adding on a "Network Access Fee" (the "NAF"), which artificially inflates the true cost of Defendant's internet service.

2. Defendant mischaracterizes its NAF as a valuable feature of Vexus in that the NAF "provides access to the Vexus network and technology and enables us to continue to invest in our network and infrastructure to deliver the best technology and services to our customers."[1]

3. But behind the guise of Defendant's benevolence is the reality that the NAF is implemented solely to extort more money from its customers.

---

[1] *What is the Network Access Fee?,* https://www.vexusfiber.com/residential/customer-care/customer-faqs/ (last accessed August 22, 2024).

4.     This is true because customers are not offered the option to elect out of the NAF, which is unequivocally charged whether the customer's network and infrastructure needs—or ever even receives—the "invest[ment]" or if they need whatever updated "technology" and "services" are purportedly provided in exchange for the fee.

5.     Rather than simply adding the mandatory NAF to the advertised and/or marketed price of the internet service itself, Vexus secretly tacks on the NAF as line item separate from the basic price of the internet service. The reason for charging its NAF in this manner is clear: the only price that consumers consider and rely upon when conducting price comparisons with similar service providers is obviously the internet service's advertised price. Reasonable consumers cannot be expected to ferret out these hidden fees that automatically increase the true price of the internet service due to their mandatory nature.

6.     Vexus' NAF is a classic example of a company-imposed "junk fee" and serves solely as a profit generator. Indeed, depending on whichever specific internet service plan a customer selects, Vexus' NAF can represent as much as **33%** of the advertised cost the internet service itself.

7.     One common example of a junk fee, one that Vexus implements, is the use of "drip pricing."  Drip pricing is "the practice of advertising only part of a product's price upfront and revealing additional charges later as consumers go through the buying process."[2] It is a category of partitioned pricing, a practice in which "sellers divide an offering's total price into two or more mandatory components such as a base price and a surcharge."[3] Specifically, drip pricing "describes a narrower partitioned pricing scenario that adds the element of delay in posting separate, mandatory prices."[4] Further, "empirical studies suggest that such pricing strategies may systematically make consumers pay more for goods and services" than they would have paid if

---

[2] MARY W. SULLIVAN, "Economic Analysis of Hotel Resort Fees," Economic Issues Paper, Bureau of Economics, Federal Trade Commission, January 2017.
[3] David Adam Friedman, Regulating Drip Pricing, 31 Stan. L. & Pol'y Rev. 51 (2020). (internal quotation marks)
[4] *Id*.

fully informed of the genuine price at the outset.[5]

8.    In fact, in recognition of the potential for deception, the Federal Trade Commission has recently banned this practice in the context of internet service. Specifically, the FTC has cautioned against "misleading door openers," calling such price advertisements "deceptive":

> [I]nternet service providers routinely do not include internet service fees, such as installation and activation fees, equipment fees, penalties for exceeding data caps, and early termination fees, in advertised prices, ***and that these fees should be considered as part of the true monthly cost of internet service that should be incorporated into advertised prices*** or prohibited when they are arbitrary or do not reflect added value.

*Trade Regulation Rule on Unfair or Deceptive Fees,* 88 Fed. Reg. 77420, 77432 (proposed Nov. 9, 2023) (to be codified at 16 C.F.R. § 464) (emphasis added).

9.    Worse yet, Vexus fails to adequately disclose the NAF to its customers in its advertisements, and customers do not discover the true cost of their internet service until after signing up or sometimes, even later on when they receive their bill. Said differently, Vexus advertises only part of a service's total price to lure in consumers and fails to mention other mandatory charges at all or until later.

10.    By unfairly obscuring the true cost of its internet service, Vexus deceives consumers and gains an unfair upper hand on competitors that fairly disclose their true Internet Service costs. Such fees are further deceptive and/or unfair in that it interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until later.

11.    As a result, Plaintiffs and Class members have been injured by Defendant's deceptive and fraudulent practices. Plaintiffs bring this action individually and on behalf of the putative Classes and seeks actual damages, and injunctive relief to prevent Defendant from continuing to engage in its illegal practice described herein.

---

[5] NAT'L ECON. COUNCIL, THE COMPETITION INITIATIVE AND HIDDEN FEES 7-15 (2016), https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/hiddenfeesreport_1 2282016.pdf (hereinafter "The Competition Initiative")

3

12.     This Court has original jurisdiction over this action, among other reasons, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of Missouri, including both named plaintiffs; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interests and costs.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction here with respect to this civil action.

## PARTIES

14.     Plaintiff Colin LaCrue is a citizen of Texas and a resident of Amarillo, Texas. Plaintiff has maintained an account with Defendant for Internet Service during all relevant times alleged herein.

15.     Plaintiff Jonathon Trahan is a citizen of Louisiana and resident of Lake Charles, Louisiana. Plaintiff has maintained an account with Defendant for Internet Service during all relevant times alleged herein.

16.     Defendant Vexus Fiber, LLC ("Vexus") is an internet service provider operating in Texas, Louisiana, and New Mexico with its headquarters in Sikeston, Missouri. Vexus offers internet, phone, and tv-streaming services for both residential and business accounts Because the citizenship of an LLC is determined by the citizenship of each of its members (s*ee, e.g., Bayerische Landesbank, New York Branch v. Aladdin Capital Management LLC*, 692 F.3d 42, 49 (2d Cir. 2012)), Defendant Vexus Fiber, LLC is a citizen of the states of Delaware and Kansas. Vexus is a Delaware limited liability company who is wholly owned by Q-Comm Python Corporation. Q-Comm Python Corporation is a Delaware corporation with a principal place of business located at 8837 Bond St. Overland Park, Kansas. Because Q-Comm Python Corporation is citizen of the states of Delaware and Kansas and Vexus is wholly owned by Q-Comm Python Corporation,

4

Vexus is therefore, a citizen of the states of Delaware and Kansas.[6] Vexus Fiber, LLC's Registered Agent is CSC-LAWYERS INCORPORATING SERVICE COMPANY, which is located in Cole County at 221 Bolivar Street in Jefferson City, MO 65101. Vexus Fiber, LLC is a limited liability company organized under the laws of the state of Delaware and has its headquarters located at 912 S Main Street Suite 106 in Sikeston, MO 63801-3134.

17.    Defendant's wrongful conduct as described herein emanates from its headquarters in Missouri.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

A.  **Vexus Deceives Consumers by Advertising its Internet Service at a Fictitiously Low Price, and then Artificially Inflating the True Cost of its Internet Service by Adding a Mandatory, Useless Network Access Fee.**

18.    Vexus is an Internet Service Provider ("ISP") that proclaims itself as "a leading provider of high-speed fiber optic internet for homes and businesses."[7]

19.    Pertinent to this action, Vexus offers an array of fiber internet plans ranging in price dependent on varying degrees of internet speed (hereinafter collectively referred to as the "Internet Service").

20.    Vexus advertises sham low-prices for its Internet Service to consumers through various marketing channels, including, but not limited to, its website, online promotions, mailing flyers, and billboards.

21.    For example, on its website, Vexus prominently advertises a variety of Internet Service Plans:

---

[6] *See*, https://interchange.puc.texas.gov/Documents/53204_17_1206656.PDF (last visited 8/12/2025) and https://docs.fcc.gov/public/attachments/DA-22-390A1.pdf (last visited 8/12/2025).
[7] *See* Vexus Fiber, About Us, located at https://www.vexusfiber.com/residential/about-vexus/, (last accessed August 22, 2024).

5



22.     Once a user selects the "Start Shopping" option, Vexus states that by entering their address, a customer can "Find the best offers in [their] area."



6

23.     Once a customer inputs an address, Vexus then states that its Internet Service plans are either $29.99, $39.99, $49.99, or $89.99 per month.



24.     Upon information and belief, in addition to the price represented in its advertisements, Vexus charges consumers a flat, monthly fee that Vexus characterizes as a "Network Access Fee" (the "NAF").

25.     Vexus' NAF is currently $10 and is charged in addition to a consumer's regular monthly charge for their Internet Service.

26.     The NAF purports to "provide access to the Vexus network and technology and enables us to continue to invest in our network and infrastructure to deliver the best technology and services to our customers."

27.     If consumers are already paying for "access" to the Vexus network via their selected monthly Internet Service, then charging an additional fee—via the NAF—for that same "access," and providing nothing more, is demonstrative of the "junk" value of this fee.

28.     Upon information and belief, Vexus does not utilize the revenue obtained from the NAF to invest in any specific customer's respective local network. Instead, Vexus applies these funds generally to their ever expanding "network," as they pursue new business opportunities in

7

other states. Consumers never agreed to help pay for Vexus' business expansion—only their own Internet Service.

29.    Further, upon information and belief, at no time does Vexus adequately advise consumers in its marketing materials prior to signing up with Vexus that their Internet Service includes the mandatory monthly NAF.

30.    Vexus' NAF is nothing more than a hidden "junk fee." Vexus advertised a price for its Internet Service that did not include the NAF, but in reality, charged every consumer a higher monthly price that included the NAF. In this way, Vexus was able to advertise an artificially lower price for its Internet Service in order to acquire more customers.

31.    Covertly applied fees like Vexus' NAF are unfair, deceptive, and misleading to consumers because they obstruct their ability to engage in true price comparisons and prevent them from participating in a fair and competitive marketplace. To illustrate, in 2022, Consumer Reports conducted a year-long study digging into the true cost of home internet services offered by numerous ISPs across the country (including Vexus) and concluded that consumers are paying exorbitant bills for broadband services, including through the assessment of "junk fees," like Vexus' NAF.[8]

32.    The study identified that "Company-Imposed Fees, aka Junk Fees" largely contributed to the widespread consumer confusion as to the true cost of internet services because they "make it difficult for consumers to budget and compare prices with alternative service options":[9]

> ***Fees.*** ISPs charge a wide range of fees that, together, can add up to a significant portion of the overall cost of service and contribute to the confusion around internet pricing. . . . The unavoidable fees are especially problematic because consumers may belief they are government-imposed when, in fact, many are company-imposed and distinguished from the core service price at the provider's discretion.

---

[8]    *See* Consumer Reports, <u>Broadband Pricing: What Consumer Reports Learned from 22,000 Internet Bills</u>, November 17, 2022, available at: *https://advocacy.consumerreports.org/wp-content/uploads/2022/11/FINAL.report-broadband.november-17-2022-2.pdf* (last accessed July 18, 2024).

[9]    *Id.* at p.3.

More than a dozen ISPs were found to charge company-imposed fees—also known as junk fees—under names such as "network enhancement fee," "internet infrastructure fee," "deregulated administration fee," and *"technology service fee."* They can surprise consumers when they appear on monthly bills, and can enable providers to raise prices without seeming to violate marketing or contractual price commitments.[10]

33.     The danger of junk fees like Vexus' NAF in the broadband market is palpable: "Such fees do a disservice to consumers by muddying the true price of broadband, making it difficult for consumers to compare prices, creating a pretext for providers to advertise low base rates while actually charging higher prices, and enabling providers to raise prices while superficially appearing to honor lower introductory or contractually promised base rates."[11]

34.     In fact, in recognition of the potential for deception, the Federal Trade Commission has recently banned this practice. Specifically, the FTC has cautioned against "misleading door openers," calling such price advertisements "deceptive":

> [I]nternet service providers routinely do not include internet service fees, such as installation and activation fees, equipment fees, penalties for exceeding data caps, and early termination fees, in advertised prices, *and that these fees should be considered as part of the true monthly cost of internet service that should be incorporated into advertised prices* or prohibited when they are arbitrary or do not reflect added value.

*Trade Regulation Rule on Unfair or Deceptive Fees,* 88 Fed. Reg. 77420, 77432 (proposed Nov. 9, 2023) (to be codified at 16 C.F.R. § 464) (emphasis added).

35.     Vexus' failure to adequately disclose the NAF to its customers in its advertisements, is a "misleading door opener" that unfairly obscures the true cost of its internet service, deceives consumers, and gains an unfair upper hand on competitors that fairly disclose their true Internet Service costs.

**B. Plaintiff LaCrue's Experience**

36.     In or around January 2025, Plaintiff LaCrue signed up for the Vexus' Internet Service for his home located in Amarillo, Texas.

---

[10]     *Id.* at p.4 (emphasis added).
[11]     *Id.* at p. 23.

9

37.     In reliance on Vexus' representations made in its advertisements and marketing materials regarding the low-price of Defendant's service, Plaintiff opened an account with Vexus and purchased the Internet Service for the price of $34.99 per month.

38.     To the best of his recollection, Plaintiff was exposed to Defendant's representations regarding its Internet Service via a flyer brought to his door. The flyer advertised an artificially low price for Vexus' Internet Service, which did not include the mandatory NAF.

39.     Based on Vexus' advertisements, including the flyer, Plaintiff selected Vexus' Service because its advertised price of $34.99 was the best price he found after comparing the services offered by similar service providers and he believed he was getting the better value by signing up for Vexus' Internet Service.

40.     However, the true cost of the Internet Service was artificially inflated as a result of Defendant's assessment of its mandatory NAF in the amount of $10.00 per month.

41.     Plaintiff did not discover the NAF until he received his monthly bill reflecting the Fee.

42.     Plaintiff would not have signed up for Vexus' Internet Service had he known that the true cost of its Service was not truly $39.99 per month.

43.     If Plaintiff had known the true cost of the Vexus Internet Service, he would have chosen another service provider.

**C. Plaintiff Trahan's Experience**

44.     In or around January 2025, Plaintiff Trahan signed up for the Vexus' Internet Service for his home located in Lake Charles, Louisiana.

45.     In reliance on Vexus' representations made in its advertisements and marketing materials regarding the low-price of Defendant's service, Plaintiff opened an account with Vexus and purchased the Internet Service for the price of $39.99 per month.

46.     To the best of his recollection, Plaintiff was exposed to Defendant's representations regarding its Internet Service via a flyer brought to his door. The flyer advertised an artificially low price for Vexus' Internet Service, which did not include the mandatory NAF.

10

47.     Based on Vexus' advertisements, including the flyer, Plaintiff selected Vexus' Service because its advertised price of $39.99 was the best price he found after comparing the services offered by similar service providers and he believed he was getting the better value by signing up for Vexus' Internet Service.

48.     However, the true cost of the Internet Service was artificially inflated as a result of Defendant's assessment of its mandatory NAF in the amount of $10.00 per month.

49.     Plaintiff did not discover the NAF until he received his monthly bill reflecting the Fee.

50.     Plaintiff would not have signed up for Vexus' Internet Service had he known that the true cost of its Service was not truly $39.99 per month.

51.     If Plaintiff had known the true cost of the Vexus Internet Service, he would have chosen another service provider.

**D.  Vexus Continues its Unlawful Misconduct Despite Consumer Complaints**

52.     Plaintiffs' experiences are far from an outlier, as various complaints online demonstrate that consumers have similarly been misled by Vexus' misconduct



r/VexusFiber · 6 mo. ago
macphoto469

## Why the deceptive pricing?

Vexus advertises a year-one price of $69.99 for 1gig fiber. But when you go to place the order, you are then presented with an additional $10 "network access fee", bringing the price to $79.99. Taxes and other government fees, fine, everyone expects those to be added on. But a mandatory company-imposed fee like this is deceptive.

If the price is $79.99, that's the price you should show.

And also consider taking a page from AT&T's playbook by stopping the churn-inducing practice of promotional pricing.

11



r/VexusFiber · 6 mo. ago
ng4ever

···

## Is $69.99 the set price for 1 Gbps up and down ?

Anything extra ?

⬆ 1 ⬇    💬 6    ↗ Share

➕ Add a Comment

Sort by:  Best ⌄    🔍 Search Comments

 macphoto469 · 6mo ago

Plus a $10 "network access fee". I find that quite annoying and deceptive... if the price is $79, just say $79, don't say $69 and then add on a mandatory $10 fee.

---



**Initial Complaint**                     **Complaint Type:** Order Issues
05/29/2024                                 **Status:** Resolved ❓

I signed up with Vexus Fiber for internet after a young man came to our house and offered an internet package for $39.99 per month. He stated repeatedly that the monthly charge would be$39.99 and not more than that for six months and that If I renewed with Vexus Fiber after six months the price would remain $39.99.Last week I discovered that my Vexus bill is $49.99 and I called Vexus twice and they will not change the monthly charge. They state there is an additional $10 fee for internet that they have to charge. However, the intial door-to-door salesman ensured me that my monthly charge would $39.99. He never mentioned any other fees or charges.This is a deceptive and misleading and dishonest sales practice.

---

## CLASS ALLEGATIONS

53.        Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiffs bring this action individually on behalf of themselves and on behalf of a class and subclasses of similarly situated persons (the "Classes"), as specifically defined below:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, held an account for an Internet Service with Vexus and were assessed a Network Access Fee.

12

54.     Plaintiffs bring this action individually and on behalf of a subclass of similarly situated persons (the "MMPA Subclass"), as specifically defined below:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, purchased the Internet Service with Vexus for personal, family, and/or household purposes and were assessed a Network Access Fee.

55.     Plaintiff LaCrue Plaintiff Trahan also brings this action on behalf of a Texas subclass, as specifically defined below:

> All consumers in Texas who, within the applicable statute of limitations proceeding the filing of this action to the date of class certification, held an account for an Internet Service with Vexus and were assessed a Network Access Fee ("the Texas Class").

56.     Plaintiff Trahan also brings this action on behalf of a Louisiana subclass, as specifically defined below:

> All consumers in Louisiana who, within the applicable statute of limitations proceeding the filing of this action to the date of class certification, held an account for an Internet Service with Vexus and were assessed a Network Access Fee ("the Louisiana Class").

57.     Excluded from the Class is Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees, and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiffs reserve the right to expand, modify, or amend the class definition, including the addition of one or more subclasses, in connection with his motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

58.     This case is appropriate for class treatment because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

59.     **Numerosity**. At this time, Plaintiffs do not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are well into the thousands, and thus, are so numerous that joinder of all members is

13

impractical. The number and identities of the members of the Classes is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

60. **Common Questions of Law and Fact Predominate**: There are many questions of law and fact common to Plaintiffs and the Classes, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

a. Whether during the class period, Defendant deceptively misrepresented and/or omitted the true cost of its Internet Service to consumers through the addition of its mandatory NAF;

b. Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

c. Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

d. Whether Plaintiffs and members of the Classes were harmed by Defendant's misrepresentations and omissions;

e. Whether Defendant violated the Louisiana Unfair Trade Practice and Consumer Protection Act, La. Stat. Ann. § 1401, *et seq.*

f. Whether Defendant violated the Missouri Merchandising Practices Act ("MMPA"), MO. REV. STAT. § 407.020;

g. Whether Defendant violated the Texas Deceptive Trade Practices Act Tex. Bus. & Comm. Code § 17.46, *et seq.;*

h. Subclasses were harmed by Defendant's misrepresentations and omissions;.

i. Whether Defendant was unjustly enriched;

j. Whether Plaintiffs and the Classes have been damaged, and if so, the proper measure of damages; and/or

k. Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct described herein.

14

61.    **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes have been similarly affected by the actions of Defendant as alleged above.

62.    **Adequacy of Representation**: Plaintiffs are committed to pursuing this action and has retained counsel competent and experienced in prosecuting and resolving consumer class actions. Plaintiffs will fairly and adequately represent the interests of the Classes and does not have any interests adverse to those of the Classes.

63.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

64.    Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Vexus as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

65.    Plaintiffs and the members of the Classes suffered and will continue to suffer harm as a result of Defendant's wrongful conduct. Vexus has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding

15

declaratory relief with respect to the Class as a whole.

## FIRST CLAIM FOR RELIEF
### Violation of the Texas Deceptive Trade Practices Act
### Tex. Bus. & Comm. Code § 17.46, *et seq.*
### On behalf of Plaintiff LaCrue and the Texas Class

66.     Plaintiff LaCrue incorporates by reference the preceding paragraphs as if fully set forth herein.

67.     Prior to the filing of this Petition, Plaintiff LaCrue gave Defendant written notice of his DTPA claim pursuant to Tex. Bus. & Comm. Code § 17.505 *et seq*.

68.     The DTPA provides additional protections to consumers who are victims of deceptive, improper, illegal or unconscionable practices. Defendant's violations include, but are not limited to, misrepresenting its NAF; misrepresenting the true cost of its Internet Service; and covertly adding its NAF to its Internet Service without adequate or fair disclosure. *See* Texas Business & Commerce Code § 17.46(b)(24).

69.     Defendant's violations induced Plaintiff LaCrue into purchasing Vexus' Internet Service. *Id*. Plaintiff relied on this deception to his detriment. *See* Texas Business & Commerce Code § 17.50(a)(1)(B).

70.     Vexus' violations were willful and were done was part of a scheme, artifice, or device with intent to defraud, mislead, and therefore are incurable deceptive acts under the DTPA.

71.     In addition, Defendant's course of action violates the DTPA because it is unconscionable: Defendant took advantage of the Plaintiff LaCrue's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. *See* Texas Business & Commerce Code §§ 17.45(5), 17.50(a)(3).

72.     Had Plaintiff LaCrue and the members of the Texas Class been aware that they were going to be charged the NAF, Plaintiff LaCrue and members of the Texas Class would not have entered into such a relationship with Vexus and would not have paid the NAF.

73.     As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the DTPA, Plaintiff LaCrue and members of the Texas Class have paid

16

more for Vexus' service than they should have and have suffered monetary damages for which Defendant is liable.

74.     Plaintiff LaCrue and members of the Texas Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DTPA. As redress for Defendant's repeated and ongoing violations, Plaintiff LaCrue and members of the Texas Class are entitled to, *inter alia,* actual damages, treble damages, attorney's fees, and injunctive relief. *See* Texas Business & Commerce Code § 17.50(b)(1).

<u>SECOND CLAIM FOR RELIEF</u>
**Violation of the Louisiana Unfair Trade Practice and Consumer Protection Act**
**La. Stat. Ann. § 1401, *et seq.***
**On behalf of Plaintiff Trahan and the Louisiana Subclass**

75.     Plaintiff Trahan incorporates by reference the preceding paragraphs as if fully set forth herein.

76.     This claim for relief is asserted on behalf of Plaintiff Trahan and the Louisiana Class under the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. § 1401, *et seq.*

77.     Plaintiff Trahan and Vexus are "persons" as defined in the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. § 1402(8).

78.     Vexus' Internet Service constitutes "trade" or "commerce" as defined in the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. § 1402(10)(a).

79.     Plaintiff Trahan and Vexus engaged in a "consumer transaction" as defined in the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. § 1402(3).

80.     The LUTPA provides protections to consumers who are victims of deceptive, unfair, or illegal acts or practices. Vexus engaged in unfair and deceptive acts and practices relating to the imposition of the challenged fees, in violation of La. Stat. Ann. § 1405. Defendant's violations include, but are not limited to, misrepresenting its NAF; misrepresenting the true cost of its Internet Service; and covertly adding its NAF to its Internet Service without adequate or fair

17

disclosure. *See* La. Stat. Ann. § 1405. Specifically, Vexus misrepresents to consumers its practice of adding mandatory, useless fees, including its NAF, which artificially inflates the true cost of its Internet Service, as alleged above.

81.     Vexus engaged in such acts and omissions intending that Plaintiff Trahan and the Louisiana Class would rely on their misrepresentations and omissions in signing up for an Internet Service with Vexus.

82.     Vexus' violations were undertaken knowingly and were done as part of a scheme, artifice, or device with intent to defraud, mislead, and therefore are incurable deceptive acts under the LUTPA. *See* La. Stat. Ann. § 1402(7).

83.     Plaintiff Trahan and the Louisiana Class relied on Vexus' misrepresentations and omissions to their detriment.

84.     Had Plaintiff Trahan and the members of the Louisiana Class been aware that they were going to be charged the NAF, Plaintiff Trahan and members of the Louisiana Class would not have entered into such a relationship with Vexus and would not have paid the NAF.

85.     As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the LUTPA, Plaintiff Trahan and members of the Louisiana Class have paid more for Vexus' service than they should have and have suffered monetary damages for which Defendant is liable.

86.     Plaintiff Trahan and members of the Louisiana Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the LUTPA. As redress for Defendant's repeated and ongoing violations, Plaintiff Trahan and members of the Louisiana Class are entitled to, *inter alia,* actual damages, treble damages, attorney's fees, and injunctive relief. *See* La. Stat. Ann. § 1409.

**THIRD CLAIM FOR RELIEF**
**Violation of the Missouri Merchandising Practices Act ("MMPA"),**
**MO. REV. STAT. § 407.020**
**On behalf of All Plaintiffs and the Class Members**

18

87.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

88.     The Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. § 407.020.1, states in relevant part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce is declared to be an unlawful practice. […] Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

89.     Plaintiffs, on behalf of themselves and the Class is entitled to bring this action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part that:

> (a) Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages. […]

> (b) Persons entitled to bring an action pursuant to subsection 1 of this section may, if the unlawful method, act or practice has caused similar injury to numerous other persons, institute an action as representative or representatives of a class against one or more defendants as representatives of a class . . .. In any action brought pursuant to this section, the court may in its discretion order, in addition to damages, injunction or other equitable relief and reasonable attorney's fees

90.     Defendant is a "person" within the meaning of the Missouri Merchandising Practices Act, Mo. Rev. Stat 407.010(4).

91.     The MMPA defines "merchandise" as any objects, wares, goods, commodities, intangibles, real estate, or services. Mo. Rev. Stat. § 407.010. Thus, the Internet Service that the Defendant provides to its customers are a "service" and thus fall within the meaning of "merchandise" within the Mo. Rev. Stat. § 407.010.

92.     Defendant's website is an "advertisement" as that term is defined by Missouri regulations.  Mo. Code Regs. Tit. 15, 60-7.020(1)(A).

93.     In providing Internet Service to its customers, Defendant is engaging in the sale of "merchandise" in trade or commerce.

94.     The actions of Defendant alleged herein violated, and continue to violate, the Missouri Merchandising Practices Act because they constitute unfair practices, deception, fraud, false promise, misrepresentation, and/or the concealment, suppression, and/or omission of material fact in the connection with the sale or advertisement of any merchandise in trade or commerce.

95.     The Missouri Attorney General has promulgated regulations defining the meaning of unfair practice as used in the MMPA. Missouri regulations define "unfair practice" pursuant to the MMPA as any practice that "[o]ffends any public policy as it has been established … by the Federal Trade Commissions … or [i]s unethical …. [and] [p]resents a risk of, or causes, substantial injury to consumers." Mo. Code Regs. Tit. 15, 60-8.020.

96.     Missouri case law provides that the MMPA's "literal words cover *every practice imaginable and every unfairness to whatever degree*." *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 416 (Mo. 2014) (quoting *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). (emphasis added). Furthermore, the statute's "plain and ordinary meaning of the words themselves . . . are unrestricted, all-encompassing and exceedingly broad." *Id.* at 240.

97.     Defendant's practices in charging more for the Internet Service than what it represents and Defendant's practices in omitting that it charges more than the amount advertised violates the MMPA because, among other things, the practices are unethical, including but not limited to violating the principles of the American Marketing Association, as set forth above.

98.     Pursuant to the MMPA, Defendant has a duty not to engage in any unethical or unfair practice in connection with the sale or advertisement of any merchandise in trade or commerce. For the reasons stated herein, it breached that duty.

99.     Missouri regulations also provide that "[a] seller shall not make a representation or statement of fact in an advertisement that is false or has the capacity to mislead prospective purchases." Mo. Code Regs. Tit. 15, 60-7.020(1).

100. Further, Missouri regulations provide: "It is a misrepresentation for any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading." Mo. Code Regs. Tit. 15, 60-9.090.

101. Missouri regulations provide:

(1) Concealment of a material fact is any method, act, use or practice which operates to hide or keep material facts from consumers.

(2) Suppression of a material fact is any method, act, use or practice which is likely to curtail or reduce the ability of consumers to take notice of material facts which are stated.

(3) Omission of a material fact is any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her.

(4) Reliance and intent that others rely upon such concealment, suppression or omission are not elements of concealment, suppression or omission as used in section 407.020.1., RSMo.

Mo. Code Regs. Tit. 15, 60-9.110.

102. Defendant's practice of charging more for Internet Service than the amount it advertises is a deceptive practice in violation of the MMPA because it is false or has the capacity to deceive.

103. Defendant's practice of charging more for its Internet Service than the amount advertised without disclosing that fact to consumers and without telling consumers that it also charges more that the advertised price violates the MMPA as an omission of material fact.

104. Plaintiff, individually and on behalf of all other Class members similarly situated, is entitled to bring this action pursuant to Mo. Rev. Stat. § 407.025, which provides in relevant part that:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by section 407.020, may bring a

21

private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages.

[…]

Persons entitled to bring an action pursuant to subsection 1 of this section may, if the unlawful method, act or practice has caused similar injury to numerous other persons, institute an action as representative or representatives of a class against one or more defendants as representatives of a class . . . . In any action brought pursuant to this section, the court may in its discretion order, in addition to damages, injunction or other equitable relief and reasonable attorney's fees.

105.    Plaintiff and the Class have suffered ascertainable loss due to defendant's unlawful practices as described herein.  Specifically, this loss is the amount that Plaintiff and the Class paid for Internet Service in excess of the advertised amount.

106.    As described above, Plaintiff acted as a reasonable consumer would in light of all circumstances.

107.    Defendant's unlawful methods, acts, and/or practices would cause a reasonable person to enter into the transaction that resulted in damages and did so cause Plaintiff, a reasonable person to enter into the transaction that resulted in damages.

108.    Plaintiff and the Class Members' claims show a likelihood that Defendant's unlawful method, act, and/or practice would mislead a reasonable consumer.

109.    Defendant's acts and practices alleged herein have directly, foreseeably, and proximately caused loss, damages, and injury to Plaintiff and the Class in an amount to be determined at trial.

110.    Defendant's unlawful acts and practices in violation of the MMPA were performed willfully and wantonly, were outrageous, and were done in reckless indifference to the rights of Plaintiff and Class, violating the MMPA.

111.    Injunctive relief is necessary and proper to compel Defendant to cease its violations of the MMPA alleged herein. As such, in addition to damages, Plaintiff seeks such equitable relief as the Court deems necessary or proper to protect Plaintiff and the Class Members from the methods, acts, or practices declared unlawful by the MMPA.

22

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### On behalf of Plaintiffs and the Class

112.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

113.   To the detriment of Plaintiffs and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

114.   Plaintiffs and the Class conferred a benefit on Defendant.

115.   Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

116.   Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

117.   Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes, respectfully requests that the Court:

      (a)   Certify this matter to proceed as a class action on behalf of the Classes;

      (b)   Declare Defendant's practices to be unlawful;

      (c)   Issue declaratory and injunctive relief as set forth above;

      (d)   Issue an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

      (e)   Issue an order for compensatory damages, and statutory damages according to proof;

      (f)   For reasonable attorneys' fees and costs of suit;

      (g)   For pre-judgment interest; and

      (h)   Awarding such other and further relief as this Court deems just, proper, and

23

equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


Dated: <u>August 12, 2025</u>                Respectfully submitted,

                                By: <u> /s/      *Tiffany Marko Yiatras*              </u>
                                Tiffany Marko Yiatras, MOW Bar No. 58197
                                **CONSUMER PROTECTION LEGAL, LLC**
                                308 Hutchinson Road
                                Ellisville, Missouri 63011-2029
                                Tele: 314-541-0317
                                Email: tiffany@consumerprotectionlegal.com

                                **JENNINGS & EARLEY PLLC**
                                Tyler B. Ewigleben*
                                Christopher D. Jennings*
                                500 President Clinton Avenue
                                Suite 110
                                Little Rock, AR 72201
                                Telephone: (317)-695-1712
                                tyler@jenningspllc.com
                                chris@jenningspllc.com

                                **KALIELGOLD PLLC**
                                Sophia Gold*
                                sgold@kalielgold.com
                                490 43rd Street, No. 122
                                Oakland, California 94609
                                Tel: (202) 350-4783

                                *Attorneys for Plaintiffs*

                                *\*Pro hac vice to be submitted*